UNITED TELEPHONE COMPANY OF OHIO, APPELLEE,
v. TRACY, TAX COMMISSIONER, APPELLANT.

[Cite as United Tel. Co. of Ohio v. Tracy (1999), 84 Ohio St.3d 506.]

(No. 97–2462—Submitted July 30, 1998—Decided February 24, 1999.)

508

*Jones, Day, Reavis, & Pogue, Maryann B. Gall, Todd S. Swatsler* and *Melanie S. Fahey,* for appellee.

*Betty D. Montgomery,* Attorney General, and *James C. Sauer,* Assistant Attorney General, for appellant.

*Per Curiam.* In our prior decision, we remanded this cause to the BTA for further proceedings to determine whether the dead and bad wire and fiber pairs at issue were used in business. We instructed the BTA to apply R.C. 5701.08 in accordance with the principles set forth in *Hatchadorian v. Lindley* (1986), 21 Ohio St.3d 66, 21 OBR 365, 488 N.E.2d 145, and *Dayton Press, Inc. v. Limbach* (1989), 42 Ohio St.3d 101, 537 N.E.2d 219.

In *Hatchadorian*, we agreed with the commissioner that the tubes contained within a coaxial cable that "had never been placed in service and were at that time incapable of use in any manner" were not being used in business. *Id.* at 69, 21 OBR at 367, 488 N.E.2d at 147. In *Dayton Press*, we affirmed the BTA's finding that certain equipment being held for disposal was not used in business, and, therefore, not taxable.

On remand, the BTA, without taking further evidence on the issue, determined that United Telephone's dead and bad pairs were not used in business and therefore were not subject to taxation.

In this appeal, the commissioner primarily contends that United Telephone's unutilized cable that exists in the form of dead and bad pairs is property that is used in business and, therefore, taxable under R.C. 5727.06 and 5709.01. We disagree.

In essence the commissioner asks that we overturn our prior decision in *Hatchadorian.* In *Hatchadorian*, the commissioner determined that the tubes contained in the coaxial cable "were not 'installed and in operation or capable of operation in the business for which acquired.'" *Id.* at 69, 21 OBR at 368, 488 N.E.2d at 147. We affirmed *Hatchadorian* in the prior appeal of this matter, and we decline to reverse it here.

The commissioner next attempts to distinguish this case from *Hatchadorian.* We will discuss each of the commissioner's contentions individually.

The commissioner first contends that because the value of the dead and bad pairs is included in United Telephone's public utility rate base, it must also be included for personal property tax purposes. We disagree.

In his dissent in *Hatchadorian*, Justice Locher set forth this argument. Nevertheless, the court rejected it. We reject it here. Subjecting property to taxation occurs under tax statutes, not public utility rate statutes.

The commissioner next contends that the coaxial tubes in *Hatchadorian* are not the same as the wires and fibers involved here. In addition, he further contends that the cost for placing the unattached coaxial cable into service in *Hatchadorian* was greater than the cost for placing United Telephone's dead wires and fibers into service. Such distinctions are not factually relevant in this case.

Factual differences in the type of wire or fiber, or the cost to place them into service, do not distinguish this case from *Hatchadorian.* The type of wire or fiber, or whether it cost more or less to place it in service than another type of wire or fiber, is not relevant in determining whether the wire or fiber pair is used in business. The relevant fact is the status of the wire or fiber pair on tax listing day. R.C. 5727.06.

The commissioner next contends that because the entire cable is taxed when it is being held in inventory, no part of it can later be excepted from taxation. We disagree.

The fact that the cable, including the dead and bad pairs contained within it, may have been subjected to taxation as inventory at some time in the past is not relevant to its current tax status. For personal property tax purposes the status of the property on the tax listing date is the relevant fact that determines its taxability. R.C. 5727.06.

The commissioner also contends that those pairs that had been connected at one time but were later disconnected, should not be included as dead pairs. We agree.

The testimony before the BTA established that pairs of wires or fibers that had been placed in service, but were temporarily disconnected on the tax listing date, were defined as "vacant" pairs. Our decision in *Hatchadorian* did not go so far as to include within the definition of "dead pairs" those pairs that had been connected but had been temporarily disconnected on tax listing day. In *Hatchadorian,* we expressly stated that the tubes in question "had *never* been placed in service." (Emphasis added.) *Id.* at 69, 21 OBR at 367, 488 N.E.2d at 147. There is a difference for personal property tax purposes between wires or fibers that have been placed in service and then temporarily taken out of service and those that have *never* been placed in service. Only those pairs that have never been placed into service can be considered as not being used in business.

United Telephone argues that our prior decision in *Gannett Satellite Info. Network, Inc. v. Limbach* (1989), 45 Ohio St.3d 148, 543 N.E.2d 1183, controls the issue of vacant pairs. It argues that *Gannett* exempts personal property that on tax listing day was not being used, even though it previously had been in use. United Telephone misinterprets *Gannett.* In *Gannett,* we held that the personal property tax did not apply to inoperable printing presses in the process of being removed. The important distinction between *Gannett* and the present case is that in *Gannett,* Gannett did not intend to operate the printing presses again. Here, the withdrawal of the vacant pairs from service is only temporary, and United Telephone intends to place them back into service. These vacant pairs are used in business and are not to be counted as dead pairs that are not used in business.

The commissioner next contends that the BTA's decision to allow United Telephone to attempt to prove the extent and value of its dead and bad pairs violated the doctrines of collateral estoppel and *res judicata*. We disagree.

Collateral estoppel and *res judicata* did not apply to this case on remand. In *Superior's Brand Meats, Inc. v. Lindley* (1980), 62 Ohio St.2d 133, 16 O.O.3d 150, 403 N.E.2d 996, we determined that collateral estoppel applied to cases before the BTA to "bar litigation of issues in a second administrative proceeding." *Id.* at syllabus. Here the BTA did not conduct a second administrative proceeding; the remanded proceeding was part of the same administrative proceeding.

Likewise, *res judicata* did not apply. In *Quality Ready Mix, Inc. v. Mamone* (1988), 35 Ohio St.3d 224, 227, 520 N.E.2d 193, 196–197, we cited the following definition for *res judicata:* " ' "[A]n existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue, as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." ' " Here, again, as with collateral estoppel, another action must be filed. However, no other action was filed in this case; therefore, the doctrine of *res judicata* does not apply.

The commissioner next turns to United Telephone's attempts to prove the amount and value of its dead and bad pairs. The commissioner argues that the statistical estimates used by United Telephone were not probative and that the BTA should not have used them to determine the amount and value of its dead and bad pairs. We agree.

For the tax years in question, United Telephone did not keep records of the amount of its dead and bad pairs. However, United Telephone possesses grid maps and work orders from which it can reconstruct the status of its system at given points in time. Because of the large number of grid maps and work orders involved, United Telephone chose not to reconstruct all of its grid maps. Instead, United Telephone chose to reconstruct only the random samples it used for determining a statistical estimate of the dead and bad pair percentages.

In utility cases, the dollar amounts are usually large and, therefore, small changes in the numbers used to calculate the taxes may mean large changes in the dollars paid by the utility and received by the taxing authorities. For instance, in this case a one-percent change in the amount of dead and bad pairs may equate to a change of over two and one-half million dollars in the value of United Telephone's cable account. The goal in tax valuation cases is to achieve as much accuracy as possible. The burden of proving the amount of the dead and bad pairs and their value was imposed upon United Telephone.

We are aware of the magnitude of the number of grid maps maintained by United Telephone and the magnitude of the effort required to accurately recon-

struct all the grid maps. However, United Telephone assumed this burden when it appealed the commissioner's order. *Hatchadorian,* paragraph one of the syllabus. The type of evidence that is acceptable to determine accurately the amount and value of dead and bad pairs cannot be varied from case to case depending upon the number of the documents involved. Statistical estimates determined from random samples cannot be used to meet the burden of proving the amount of dead and bad pairs when there are documents available from which an accurate count of the number of dead and bad pairs can be obtained.

The commissioner further contends that United Telephone's use, and the BTA's acceptance, of a statistical estimate to determine the value of the dead and bad pairs was not probative of value. We agree.

To determine the value to be deducted for its dead and bad pairs, United Telephone used its estimated percentage of dead and bad pairs and multiplied it times the value of all its cable. However, testimony and exhibits presented to the BTA established that United Telephone annually records the cost assigned to its installed cable. An exhibit produced by United Telephone showed that the installed cost for cable varies with the type of cable and the number of wire or fiber pairs contained within it. Depending upon the type and size of cable, the installed cost per foot can vary from slightly over three dollars to over nineteen dollars. Likewise, the installed unit cost per wire or fiber pair will vary depending upon the type and size of the cable. Using a statistical estimate for the amount of dead and bad pairs and then applying that estimate to the total cable cost ignore the fact that different dead and bad pairs have a different cost.

Even if United Telephone's determination of the percentage of dead and bad pairs were shown to be correct, the actual cost of the dead and bad pairs to be deducted cannot be determined by use of that percentage. To accurately determine the cost of the dead and bad pairs, the actual amount (length) of the dead and bad pairs must be identified, and the cost assigned to the installed cable containing those pairs must be used as the base to make an allocation for the cost to be deducted for the dead and bad pairs. How the total cost for an installed cable should be allocated between working pairs and dead and bad pairs we need not determine at this time. In this case, no attempt was made to determine the actual cost that should be assigned to the dead and bad pairs. The actual cost of the dead and bad pairs is the goal to be attained. A proper allocation that yields the cost of the dead and bad pairs is the only deduction that should be allowed. In this case, there was no evidence presented of the installed cost of the cables containing the dead and bad pairs; therefore, there was no basis to make a determination of the cost of the dead and bad pairs.

Our disallowance of the method used by United Telephone to determine the amount and value of its dead and bad pairs is dispositive of this matter;

therefore, we will not address the remaining contentions raised by the commissioner.

In summary, we affirm that portion of the BTA's decision that found that the dead and bad pairs were not used in business. However, we find unreasonable and unlawful, and reverse, those portions of the BTA decision that found vacant pairs not to be used in business and that accepted United Telephone's method of determining the amount and value of its dead and bad pairs.

*Decision affirmed in part*
*and reversed in part.*

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

MOYER, C.J., and COOK, J., concur separately.

PFEIFER and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

---

**COOK, J., concurring.** I differ from the majority in that I would not review the decision of the BTA regarding the later-offered evidence because the remand by this court did not encompass the authority to take additional proof.

Our remand in this case was limited to determining whether United Telephone qualified for a particular tax deduction. The BTA had no authority to enlarge or vary our mandate. *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 4, 11 OBR 1, 3, 462 N.E.2d 410, 413. Rather, the BTA was required to proceed from the point at which the error occurred. *State ex rel. Stevenson v. Murray* (1982), 69 Ohio St.2d 112, 113, 23 O.O.3d 160, 431 N.E.2d 324, 325. Here, the error occurred after presentation of all the evidence when the BTA mistakenly concluded that the requested deduction was no longer available. On remand, then, the BTA was limited to applying the correct law to the evidence already presented.

Technically, our remand was unnecessary because, in its initial decision, the BTA reviewed the quality of the first evidence presented and found it lacking. Even though United Telephone demonstrated that it qualified for the deduction, it failed to meet its burden to prove the amount.

The majority's ultimate conclusion is correct in light of the BTA's initial finding that United Telephone failed to present adequate proof in the first hearing. I would stop short of evaluating the evidence presented at the second hearing because doing so sanctions the procedural mistake.

MOYER, C.J., concurs in the foregoing concurring opinion.

---

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.** I concur with the majority's conclusion that dead and bad pairs of wires should not be taxed, but that "vacant" or disconnected but reusable pairs should be included as taxable property.

However, I disagree with the majority's holding that the method of proof in establishing the value of the dead and bad pairs by statistical estimates was unacceptable. The commissioner had ample opportunity at trial to challenge those statistics, present evidence of his own to refute the validity of the statistics, or to otherwise argue the inadequacy of the evidence. This court's function is to determine whether the BTA's decision is reasonable and lawful, not to reweigh evidence. R.C. 5717.04; *Highlights for Children v. Collins* (1977), 50 Ohio St.2d 186, 187–188, 4 O.O.3d 379, 380, 364 N.E.2d 13, 15. The BTA as the trier of fact evaluated all the evidence and made its determination based on that evidence. While we may want more precision or accuracy in the calculations, that is an issue of weight and credibility for the BTA to decide. The BTA's evaluation of the validity of the statistical estimates does not rise to the level of "unreasonable or unlawful" action.

Because I would find that the BTA's decision was reasonable and lawful, I would affirm the decision of the BTA on the value of the dead and bad pairs.

The majority's opinion also leaves uncertain what happens next. Does reversal mean that United Telephone has failed to establish *any* value, and therefore must now be taxed on the dead and bad pairs, especially since we have just held that such pairs should *not* be taxed? Surely this is an extremely unjust and harsh result, considering the very large amount of tax involved. Does the commissioner get to choose the value? Does the reversal include a remand to reopen the case and allow United Telephone another opportunity to establish value by other methods? These issues remain unresolved in light of the court's reversal. Therefore, I respectfully dissent from this portion of the opinion.

PFEIFER, J., concurs in the foregoing opinion.